IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                             Plaintiff/Respondent,<br><br>    vs.<br><br>JACOB DRUMMONDO-FARIAS,<br><br>                        Defendant/Movant. | Cr. No. 12-00174 JMS<br>Civ. No. 17-00030 JMS-RLP<br><br>ORDER DENYING (1) MOTION UNDER § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, ECF NO. 307;<br>(2) MOTION FOR DISCOVERY, ECF NO. 313; AND<br>(3) CERTIFICATE OF APPEALABILITY |

## ORDER DENYING (1) MOTION UNDER § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE, ECF NO. 307; (2) MOTION FOR DISCOVERY, ECF NO. 313; AND (3) CERTIFICATE OF APPEALABILITY

## I. INTRODUCTION

Before the court are Defendant/Movant Jacob Drummondo-Farias'

("Defendant" or "Movant") Motion under 28 U.S.C. § 2255 To Vacate, Set Aside,

or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), ECF No.

307,[1] and Motion for Discovery, ECF No. 313.  Defendant challenges his

conviction and sentence alleging violations of his constitutional rights to due

process and a fair trial based on: (1) "newly discovered evidence";

---

[1] Although the § 2255 Motion generated a separate civil action, citations to the record are to the underlying criminal action — Cr. No. 12-00174 JMS.

(2) prosecutorial misconduct; (3) judicial misconduct; and (4) ineffective assistance of counsel.

For the reasons discussed below, the court DENIES Defendant's § 2255 Motion, DENIES the Motion for Discovery as moot, and DENIES a Certificate of Appealability.

## II. BACKGROUND

### A. Procedural Background

On February 9, 2012, a grand jury returned an Indictment charging Defendant, Joshua Miller ("Miller"), and Brandon Jones ("Jones") with one count of conspiracy to distribute, and possess with intent to distribute, 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). ECF No. 15. A First Superseding Indictment charged the same offense against Defendant and Jones,[2] based on 50 grams or more of methamphetamine. ECF No. 54. A jury trial commenced against Defendant,[3] and on October 9, 2012, after the jury failed to reach a verdict, the court declared a mistrial. ECF No. 102.

---

[2] Miller was charged with the same offense in a separate action, and pled guilty on July 31, 2012. *See* ECF No. 38; *see also United States v. Miller*, Cr. No. 12-00744 JMS.

[3] On October 3, 2012, Jones pled guilty to Count 1 of the Superseding Indictment. ECF No. 91.

A Second Superseding Indictment added a new co-defendant, Joshua Lew ("Lew"). ECF No. 120. And on September 19, 2013, a Third Superseding Indictment charged Defendant and Lew with one count of conspiring with Miller and Jones to distribute, and possess with intent to distribute, 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A); and charged Defendant alone with distribution of 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). ECF No. 173.

Trial against Defendant and Lew commenced on November 4, 2013, and on November 8, 2013, Lew pled guilty to Count 1 of the Third Superseding Indictment. ECF Nos. 223, 228. On November 14, 2013, a jury found Defendant guilty of Count 1 and not guilty of Count 2. ECF No. 240. On February 24, 2014, this court sentenced Defendant to a term of 324 months imprisonment, followed by 10 years of supervised release. ECF No. 259.

The Ninth Circuit affirmed Defendant's conviction and sentence[4] on August 5, 2015, ECF No. 291, and the Supreme Court denied Defendant's petition for writ of certiorari on January 19, 2016. ECF No. 302. Defendant timely filed

---

[4] On appeal, Defendant argued that Counts 1 and 2 were improperly joined in the Third Superseding Indictment, and that this court erred in granting a motion in limine regarding impeachment evidence of a government witness. *See* § 2255 Motion at PageID # 2852.

the instant § 2255 Motion on January 18, 2017.[5]  ECF No. 307.  On February 7 and

21, 2017, Defendant filed motions to amend and/or supplement the § 2255 Motion.

ECF Nos. 311, 314.  The court granted both motions and ordered that the § 2255

Motion be construed as including the additional documents Defendant sought to

add.  ECF Nos. 312, 315.

On February 21, 2017, Defendant filed a Motion for Discovery.  ECF

No. 313.  The court held the motion in abeyance and directed the Government to

address the motion in its Response to the § 2255 Motion.  ECF No. 316.  On April

28, 2017, the Government filed its Response to both the § 2255 Motion and the

Motion for Discovery.[6]  ECF No. 322.  Defendant filed a Reply on May 30, 2017.

ECF No. 324.  Pursuant to an October 20, 2017 Order, ECF No. 327, the

Government filed a Supplemental Statement on October 26, 2017, ECF No. 329.

On December 8, 2017, Defendant filed a Reply to the Government's Supplemental

Statement.  ECF No. 330.

---

[5] Although the § 2255 Motion was file-stamped by the Clerk of Court on January 23, 2017, under the prison "'mailbox rule,' a pro se prisoner's filing of a . . . habeas petition is deemed filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of the court."  *Noble v. Adams*, 676 F.3d 1180, 1182 (9th Cir. 2012) (quoting *Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003)).

[6] The Government's response lacked specificity and fell short of the court's expectations. As an example, simply stating that "[i]t is not necessary to address each of the alleged violations in regard to the Government witnesses," Govt's Resp. at 25, provides no guidance to the court.

**B.    Factual Background**

On January 26, 2012, law enforcement officers noticed a suspicious parcel at the Honolulu airport postal facility addressed to J. Roth at 1638 Young Street #2, Honolulu, Hawaii.  Trial Tr. at 2-172 to 2-174; Presentence Report ("PSR") ¶ 10, ECF No. 258.  A narcotic-detecting dog "alerted" on the parcel, and a federal search warrant was obtained and executed on the parcel.  Trial Tr. at 3-119; PSR ¶ 10.  In the parcel were two protein powder bottles, each concealing two plastic bags containing a total of 889.9 grams of methamphetamine.  PSR ¶¶ 10, 11; *see* Trial Tr. at 3-155 (verifying total weight of seized methamphetamine).  The methamphetamine was removed and replaced with pseudo-methamphetamine, a small quantity of the seized methamphetamine, and a tracking device to allow a controlled delivery to the destination address.  *Id.* ¶ 11.

On January 27, 2012, investigators determined that someone was checking the shipping status of the parcel via the internet.  *Id.* ¶ 12.  The Internet Provider address of the inquirer was also monitoring the status of a second parcel sent by J. Lew from a Waialua, Hawaii address to J. Camacho in Citrus Heights, California.  *Id.*; Trial Tr. at 5-144.

At about 1:34 p.m. on January 27, 2012, an undercover investigator delivered the parcel to 1638 Young Street #2, where Jones accepted it.  PSR ¶ 13;

Trial Tr. at 3-178 to -89.  Jones then walked to a nearby Jack in the Box restaurant at the corner of King Street and Punahou Street.  PSR ¶ 13; Trial Tr. at 3-179 to -80.  There, Jones met with Lew, who arrived driving an Acura sedan, and Miller and Defendant, who arrived together in a Nissan Pathfinder.  PSR ¶ 13; Trial Tr. at 3-180 to -82.  Jones wanted to leave at that time, but Defendant told him that he had to go back to the apartment to get the package.  Trial Tr. at 3-182, 4-54, 5-307.  At about 1:53 p.m., Miller and Defendant left in the Pathfinder, and at about 2:19 p.m., Lew left in the Acura.  PSR ¶ 13.

Jones left the Jack in the Box at about 2:34 p.m. and walked back to the Young Street apartment.  PSR ¶ 14; *see* Trial Tr. at 3-184.  Shortly thereafter, the beeper in the parcel activated, indicating that the parcel had been opened.  PSR ¶ 14.  Jones was arrested as he was leaving the Young Street apartment carrying the bottles of protein powder that contained the pseudo-methamphetamine.  PSR ¶ 14; Trial Tr. at 3-185.  Jones told law enforcement officers that he was supposed to take the protein bottles to Ala Moana Shopping Center ("AMSC") and give them to Defendant.  PSR ¶ 14.  Officers proceeded to AMSC and arrested Defendant and Miller.  PSR ¶ 14; *see* Trial Tr. at 5-44, -87 to -88.

Miller consented to a search of his Nissan Pathfinder, which resulted in the discovery of Defendant's backpack containing a number of blank Western

Union money orders and two Western Union money order receipts dated January 22, 2012. PSR ¶ 16; *see* Trial Tr. at 3-100 to -06, 5-88 to -89. One receipt was for $3,000, listed Miller as the sender and Lew as the recipient, and was sent from the Foodland on School Street to a store in Fontana, California. PSR ¶ 16; *see* Trial Tr. at 5-137. The other, also for $3,000, listed Defendant as the sender and Alaine[7] Parkerson as the recipient, and was sent from the Foodland at AMSC to Citrus Heights, California. PSR ¶ 16; *see* Trial Tr. at 5-136. Defendant's backpack also contained a notebook with "pay/owe" sheets. PSR ¶ 16; Trial Tr. at 4-116 to -20.

On January 30, 2012, a search warrant was executed on the second parcel that was tracked via the internet and sent by "J. Lew" to "J. Camacho" in Citrus Heights, California, resulting in the discovery of $21,000 in cash hidden in a macadamia nut candy box. PSR ¶¶ 12, 18. During a search of the Young Street apartment, investigators found an unspecified number of macadamia nut boxes. *Id.* ¶ 18; Trial Tr. 3-50. Lew was arrested on March 29, 2013. PSR ¶ 18.

On November 4, 2013, Defendant and Lew appeared for jury trial. *Id.* ¶ 19. Before the end of trial, on November 8, 2013, Lew pled guilty to Count 1 of the Third Superseding Indictment. *Id.* At trial, the Government presented 30

---

[7] Alaine Parkerson's first name is spelled with an "A" in the PSR, but with an "E" in the trial transcript. For consistency, the court uses the spelling reflected in the PSR.

witnesses including Jones, Miller, and Julio Camacho.  *Id.*  Defendant did not present any witnesses and did not testify at trial.  *Id.*

After his arrest on January 27, 2012, Jones provided a statement to investigators that was consistent with his trial testimony.  PSR ¶ 17.  Jones stated that he grew up with Defendant, Lew, and Miller, in Waialua.  PSR ¶ 17; Trial Tr. at 3-169, -173 to -74.  On January 27, 2012, Lew called Jones and asked if he could accept a parcel at the Young Street apartment in return for $100.  Trial Tr. at 3-171 to -72.  Lew then picked up Jones from his apartment in Waikiki and drove him to the Young Street apartment.  *Id.* at 3-170 to -72.  After receiving the parcel, Jones called Lew, who instructed Jones to go to the Jack in the Box.  *Id.* at 3-179 to -80.  There, Jones met with Defendant, Miller, and Lew.  *Id.*  Jones heard Defendant and Lew discussing that if law enforcement was aware of the parcel, they would have been arrested by now.  *Id.* at 3-182.  Defendant instructed Jones to go back to the Young Street apartment, open the parcel, and bring the protein powder bottles to AMSC.  *Id.* at 3-182 to -84.  Jones stated that he knew the parcel contained methamphetamine because he had previously received packages containing drugs for Defendant and Lew at his Waikiki apartment.  PSR ¶ 22; Trial Tr. at 3-173 to -75, -183.  He further stated that he, Defendant, Lew, and Miller

were involved with drugs in one way or another, including distribution.  Trial Tr. at 3-175 to -76, -183.

After his arrest, Miller also provided a signed statement to investigators that was consistent with his trial testimony.  PSR ¶ 15.  Miller stated that he grew up with Defendant, Jones, and Lew in Waialua.  PSR ¶ 15; *see* Trial Tr. at 5-46 to -47.  He had recently moved back to Waialua, but paid the rent through the end of the month for the Young Street apartment.  PSR ¶ 15; *see* Trial Tr. at 5-49 to -51 (clarifying that Miller allowed Defendant to take over paying the rent).  He granted permission for Defendant, Jones, and Lew to hang out at the Young Street apartment.  PSR ¶ 15; *see* Trial Tr. at 5-50 (explaining that Miller let Defendant, Jones, and Lew take over the Young Street apartment).  Miller further stated that he knew that Defendant and Lew were distributing methamphetamine and admitted to receiving $200 from Defendant for sending $3,000 to California via Western Union.  PSR ¶ 15; Trial Tr. at 5-50 to -53, -55.  He also stated that he drove Defendant to the post office to mail a parcel to California that Defendant told him contained $20,000 for Lew to use to purchase methamphetamine, and that he drove Defendant to the airport to pick up Lew after Lew met with drug sources in California.  PSR ¶ 15; Trial Tr. at 5-60, -66 to -67, -90 to -91.

Miller testified that on January 27, 2012, he picked up Defendant and they went first to AMSC and then to Young Street. Trial Tr. 5-69, -76 to -78; *see* PSR ¶ 15. Miller stated that he knew the parcel would be delivered that day, so they were looking for undercover officers. Trial Tr. 5-76; *see* PSR ¶ 15. Miller further testified that they met Lew at O'Reilly's parking lot, and then went back to AMSC to wait for Lew's call telling them that the parcel containing methamphetamine had been delivered. Trial Tr. at 5-77 to -79.

After receiving Lew's call, Defendant and Miller went to the Jack in the Box, where they met Jones and Lew. Trial Tr. at 5-79 to -80. The co-conspirators discussed concerns about the delivery, but Defendant indicated there was nothing to worry about and told Jones to return to the apartment and open the package. *Id.* at 5-80 to -82. Miller understood that after opening the parcel, Jones was supposed to deliver the protein powder bottles containing methamphetamine to Defendant at AMSC. PSR ¶ 15; *see* Trial Tr. at 5-77 to -82.

Miller testified that after Jones went back to the Young Street apartment, he and Defendant went back to AMSC. Trial Tr. at 5-82; PSR ¶ 23. After not hearing from Lew and Jones, Defendant instructed Miller to return to the Young Street apartment to check on the situation. Trial Tr. at 5-84; PSR ¶ 23. When he did so, Miller saw law enforcement vehicles at the apartment, returned to

AMSC, and told Defendant what he had seen. Trial Tr. at 5-85 to -86; PSR ¶ 23.

Miller testified that Defendant then stated that he had just lost $50,000. Trial Tr. at

5-86; PSR ¶ 23. An expert witness for the Government testified that the estimated

street value of one pound of methamphetamine was $24,000 to $30,000, and that

one kilogram would equal approximately 2.2 pounds of methamphetamine. Trial

Tr. at 4-208. And the total weight of the methamphetamine seized was 889.9

grams, or just under one kilogram. *Id.* at 3-155.

With respect to the second parcel, Miller testified that he and

Defendant picked up Lew from the airport on or about January 25, 2012,

immediately drove to the airport post office, gave Lew the second parcel, and that

Lew filled out the mailing label and mailed the parcel. Trial Tr. at 5-90 to -92;

PSR ¶ 24. The Government introduced flight records showing that Lew arrived on

a Hawaiian Airlines flight from Sacramento, California to Honolulu, Hawaii at

1:35 p.m. on January 25, 2012, and that the second parcel was mailed at 2:18 p.m.

that same day. PSR ¶ 24; Govt's Exs. 62, 76.

Camacho testified that he met Lew when they worked together in

California. Trial Tr. at 4-148; PSR ¶ 20. They lost contact for a period of time,

but reconnected in November 2011. *Id.* Camacho testified that they began

discussing methamphetamine distribution and that Lew "was excited because . . .

[t]here was a market for . . . that product here in Hawaii, and he knew the people to distribute it." Trial Tr. at 4-161. Camacho testified that Lew identified "the person" as "[h]is brother Jacob," described Jacob as "well connected," and stated that "making money is something that his brother was good at." *Id.* at 4-161, -167 to -68. Camacho then testified about his agreement with Lew to obtain sources of methamphetamine in California and transport the drugs to Hawaii for distribution; Lew's travel between California and Hawaii; their purchase of methamphetamine from "Primo," and later from another source in Fontana, California; wire transfers via Western Union of drug proceeds sent to him, as well as his girlfriend Alaine Parkerson, and her brother; and the packaging and mailing of parcels containing methamphetamine. *Id.* at 4-159 to -179. Camacho testified that he met Primo, his first source, through one of his employees named Kora. *Id.* at 4-157 to -60. Camacho testified that his contact with Lew abruptly ended after Lew called to say "Shit went down. They caught my brother. You need to turn off your phone. I'm getting out of town. You need to get out of town." *Id.* at 4-183.

The Government introduced business records from Western Union showing wire transfers sent by Defendant and Miller to California, *id.* at 4-94 to -96, 4-108 to -09, 5-133 to -38; Govt's Exs. 43, 43-A; U.S. Postal Express Mail labels showing a pattern of parcels mailed to co-conspirators consistent with the

12

seized parcel, Trial Tr. at 5-141 to -50; Govt's Exs. 65, 67, 69, 71, 73; and

telephone records establishing frequent phone contact among the co-conspirators

culminating in a flurry of calls made to Jones and Lew following Jones' arrest

from pay phones at AMSC while Defendant and Miller were there, Trial Tr. at

5-167 to -76; Govt's Ex. 93.

### III. <u>STANDARDS OF REVIEW</u>

The court's review of Defendant's § 2255 Motion is governed by 28

U.S.C. § 2255(a):

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right to be
> released upon the ground that the sentence was imposed
> in violation of the Constitution or laws of the United
> States, or that the court was without jurisdiction to
> impose such sentence, or that the sentence was in excess
> of the maximum authorized by law, or is otherwise
> subject to collateral attack, may move the court which
> imposed the sentence to vacate, set aside or correct the
> sentence.

To obtain relief based on a constitutional violation, a movant must

demonstrate that an error of constitutional magnitude had a substantial and

injurious effect or influence on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993); *United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003).

That is, to warrant relief, a movant must show the existence of "a fundamental

defect which inherently results in a complete miscarriage of justice." *Davis v.*

*United States*, 417 U.S. 333, 346 (1974) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)); *see United States v. Gianelli*, 543 F.3d 1178, 1184-85 (9th Cir. 2008).

## A.     Evidentiary Hearing

A court must hold an evidentiary hearing to determine the validity of a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the [movant] is entitled to no relief."  28 U.S.C. § 2255(b). "In determining whether a hearing and findings of fact and conclusions of law are required, '[t]he standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted.'" *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011) (quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)).  An evidentiary hearing is not required where the movant's allegations, when viewed against the record, do not state a claim for relief or are "so palpably incredible or patently frivolous as to warrant summary dismissal." *Schaflander*, 743 F.2d at 717.  No hearing is required when credibility issues can be "conclusively decided on the basis of documentary testimony and evidence in the record." *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988).  Conclusory statements in a § 2255 motion are insufficient to require a hearing. *United States v. Johnson*, 988 F.2d 941, 945 (9th

Cir. 1993).  Rather, a movant must "allege specific facts which, if true, would entitle him to relief."  *United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (internal quotation marks and citation omitted).

## B.    Procedural Default

A § 2255 movant procedurally defaults those claims that could have been raised on direct appeal, but were not.  *Bousley v. United States*, 523 U.S. 614, 622 (1998); *United States v. Ratigan*, 351 F.3d 957, 962 (9th Cir. 2003); *United States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985) ("Section 2255 is not designed to provide criminal defendants repeated opportunities to overturn their convictions on grounds which could have been raised on direct appeal.").  Procedural default may be overcome "only if the defendant can first demonstrate either 'cause' and actual 'prejudice' or that he is 'actually innocent.'"  *United States v. Braswell*, 501 F.3d 1147, 1149 (9th Cir. 2007) (citing *Bousley*, 523 U.S. at 622).  Habeas review is not a substitute for an appeal.  *Bousley*, 523 U.S. at 621.

"Cause" that excuses the failure to raise a claim on appeal "must be something *external* to the [movant], something that cannot fairly be attributed to him."  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Examples of external factors that constitute cause include "interference by officials," or "a showing that the factual or legal basis for a claim

was not reasonably available to counsel." *Murray*, 477 U.S. at 488; *see United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1993) (explaining that "cause can be established by showing that the claim is based on newly discovered evidence that could not reasonably have been discovered" prior to default).

If a movant shows "cause," the "actual prejudice" prong requires a movant to demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

A movant who fails to demonstrate cause and prejudice can overcome procedural default by demonstrating that he is "factually innocent, not merely that his conviction was legally insufficient." *Hirano v. United States*, 2017 WL 2661629, at *6 (D. Haw. June 20, 2017) (quoting *Jones v. McGrew*, 2014 WL 2002245, at &4 (C.D. Cal. May 15, 2014)); *see Bousley*, 523 U.S. at 623 ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency."). "To establish actual innocence, [a movant] must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Muth v. Fondren*, 676 F.3d 815, 819 (9th Cir. 2012) (citation omitted). And to demonstrate factual innocence, a movant must produce "new reliable evidence

— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Without such evidence, "even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316.

Exceptions to the cause and prejudice requirement include (1) claims that could not be presented without further factual development, and (2) ineffective assistance of counsel claims. *See Bousley*, 532 U.S. at 621-22 (claims requiring further factual development); *Massaro v. United States*, 538 U.S. 500, 505 (2003) (ineffective assistance of counsel claims); *see also Braswell*, 501 F.3d at 1150 n.1 (citing both *Bousley* and *Massaro*).

## IV. <u>DISCUSSION</u>

Defendant asserts grounds for relief that fall into four broad categories, none of which was raised on direct appeal: (1) new evidence; (2) prosecutorial misconduct; (3) judicial misconduct; and (4) ineffective assistance of counsel. Because the instant § 2255 Motion can conclusively be decided based on the existing record, the court need not hold an evidentiary hearing.

## A.    New Evidence

### 1.    *Legal Standard*

Claims solely based on new evidence that fail to prove actual innocence are generally not cognizable under § 2255.  *See United States v. Berry*, 624 F.3d 1031, 1038 (9th Cir. 2010); *see also Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("[T]he existence merely of newly discovered evidence relevant to the guilt of a [defendant] is not a ground for relief on federal habeas corpus.") (emphasis and citation omitted); *Conley v. United States*, 323 F.3d 7, 14 (1st Cir. 2003) (en banc) ("Merely to claim that new evidence casts doubt, even grave doubt, on the correctness of a conviction is not a ground for relief on collateral attack.").  To be cognizable, a § 2255 motion must be based on an independent constitutional violation.  *Berry*, 624 F.3d at 1038.[8]

---

[8] Absent an independent constitutional violation, the proper avenue for relief based on newly discovered evidence is a motion for new trial.  *See* Fed. R. Crim. P. 33(b)(1).  But such a motion "must be filed within 3 years after the verdict or finding of guilty."  *Id.*  And while a district court may construe a § 2255 motion as a Rule 33 motion for new trial, it may do so only if the Rule 33 motion would have been timely or the government has waived any objection to Rule 33 timeliness.  *Berry*, 624 F.3d at 1039 (citing *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000)); *see Eberhart v. United States*, 546 U.S. 12, 13 (2005) (per curiam) (explaining that the Rule 33 time limitation is not jurisdictional and is therefore waivable if the government does not object to an untimely motion).

Here, the jury found Defendant guilty on November 14, 2013.  Defendant filed the instant § 2255 Motion on January 18, 2017, more than three years later.  And the Government did not waive its objection to Rule 33 timeliness.  *See* Govt's Resp. at 22, ECF No. 322.  Thus, even if construed as a Rule 33 motion for new trial, such motion is time-barred.

## 2.    *Application of Legal Standard*

In Ground One, Defendant claims that his constitutional rights to due process and a fair trial were violated because newly discovered evidence shows that:

- Camacho, a government witness, provided perjured testimony during trial regarding his involvement and connections to the drug trade;

- Prior to being sentenced, Lew told the Government that Defendant was not involved in the drug conspiracy; and

- the Assistant United States Attorney ("AUSA") attempted to influence Sandrina Crowley ("Crowley"), a government witness, to provide false testimony.

*See* § 2255 Motion at PageID # 2872-74.  Defendant provides declarations from Laurietta Farias relating statements Lew made to her, and an affidavit from Sandrina Crowley.  *See* Laurietta Farias Decl. dated January 13, 2017 ("Farias Decl. I"), ECF No. 314-2; Laurietta Farias Decl. dated February 7, 2017 ("Farias Decl. II"), ECF No. 314-1; Sandrina Crowley Aff. dated December 30, 2016, ECF No. 307-2.

Defendant does not claim that this newly discovered evidence establishes that he is actually innocent.[9]  Thus, he must show that this newly

---

[9] Defendant asserts that he "has continuously maintained his innocence from the time of his arrest, and continues to," § 2255 Motion at PageID # 2873, but he does not argue that his new evidence establishes his factual innocence.  Rather, he claims that each of these items of new

(Continued . . . )

discovered evidence supports an independent constitutional violation. As discussed below, the court finds that Defendant fails to do so.

### 1. *Camacho's Testimony*

Defendant alleges that in November 2016, he learned that Camacho's trial testimony — that Camacho first met his drug source, Primo, through a co-worker, and that Camacho's brothers were not his source of drugs[10] — was perjured. § 2255 Motion at PageID # 2872. Defendant provides his mother's affidavit stating that Lew told her that: (1) Camacho told Lew "about his involvement with his brother and father in drug distribution"; (2) Camacho's brother is a well-known singer in Mexico, is known as "Primo," and produces drugs to sell at his ranch in Sacramento; and (3) Camacho's father works for the Sacramento post office and "helps pass . . . drugs through the mail." Farias Decl. I at ¶¶ 1-3.

The introduction of perjured testimony, without more, does not rise to the level of a constitutional violation warranting federal habeas corpus relief. *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The essence of the

---

(. . . continued)
evidence shows that he was deprived of his constitutional rights of due process and a fair trial. *See id.* at PageID # 2873, 2875.

[10] Trial Tr. at 4-159, 4-188 to -89, 4-19.

due process violation is misconduct by the government, not merely perjury by a witness.") (citation omitted); *see also Shore v. Warden,* 942 F.2d 1117, 1122 (7th Cir. 1991). Rather, a defendant's constitutional right to due process is violated when "the prosecution's case includes perjured testimony[,] . . . the prosecution knew, or should have known, of the perjury," *United States v. Agurs*, 427 U.S. 97, 103 (1976), and the perjured testimony "was material," *Hein v. Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010). Perjured testimony is material "if there is any reasonable likelihood that the false [testimony] could have affected the judgment of the jury." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). That is, "[t]he question is not 'whether the defendant would more likely than not have received a different verdict' if the false testimony had not been presented, but whether the defendant 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 2831 (2013) (citation omitted).

Here, Defendant fails to provide any evidence whatsoever that the AUSA knew or should have known that Camacho's trial testimony regarding Primo was false (even assuming it was false). And the court will not simply presume that the AUSA elicited perjurious testimony. *See United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989) ("The record does not show and we

do not presume that the prosecutor used false testimony."). Thus, Defendant fails to show that newly discovered evidence of Camacho's allegedly perjured testimony supports an independent constitutional violation. And absent an independent constitutional violation, Defendant's claim is not cognizable under § 2255.

### 2. *Lew's Statement*

Defendant alleges that his "mother also relayed to him that [Lew] told her that he made statements to the [AUSA], prior to being sentenced, that the [Defendant] was not involved."[11] § 2255 Motion at PageID # 2872-73. Defendant's mother's affidavit, states that Lew told her that: (1) "[w]hile being questioned by the Government, [he] state[d] that [Defendant] had no involvement with drug distribution or setting up any type of scheme to conduct business of such"; (2) Lew "mentioned to the Government that [Defendant] never met or spoke with . . . Camacho"; and (3) Lew's "attorney was not present" when he made these statements. Farias Decl. II at ¶¶ 1-3.

The § 2255 Motion does not specify *when* Lew allegedly made these statements to the AUSA. On October 20, 2017, this court thus directed the Government to "file a supplemental statement specifying all dates when Joshua

---

[11] Defendant was convicted by a jury on November 14, 2013. ECF No. 240. Lew pled guilty on November 8, 2013, and was sentenced on June 30, 2014. ECF Nos. 228, 285.

Lew was interviewed or debriefed by government agents or counsel in this matter," and directed Defendant to file a response indicating, if possible, "the date on which Lew allegedly made the statement to the government that Defendant was not involved in drug trafficking." ECF No. 327. According to the Government, Lew was debriefed only one time by a DEA agent on February 4, 2014, and that rather than vindicate Defendant, Lew *implicated* him in the alleged drug distribution conspiracy. *See* Govt's Suppl. Stmt. at 2; *see also* Govt's Ex. "A," ECF No. 329-1. Defendant disputes the content of the DEA agent's report, but does not dispute the February 4, 2014 date or suggest that Lew made any statement other than the one on February 4, 2014. *See* Petr's Reply at 2-3, ECF No. 330.

Pursuant to the Fifth Amendment's Due Process clause, the Government must disclose exculpatory information to the defense. *Brady v. Maryland*, 373 U.S. 83, 86-87 (1963). But there can be no *Brady* violation absent a showing that the Government (1) had information favorable, and unknown, to the defense (2) that it suppressed *before or during trial*, and (3) there must have been a reasonable probability that had the information been disclosed, *the outcome of the trial* would have been different. *United States v. Mazzarella*, 784 F.3d 532, 538 (9th Cir. 2015) (citations omitted); *see Bagley*, 473 U.S. at 678 (explaining that *Brady* applies upon the post-trial discovery of "information favorable to the

accused which had been known to the prosecution but unknown to the defense");

*Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) ("[W]here the defendant is aware

of the essential facts enabling him to take advantage of any exculpatory evidence,

the Government does not commit a *Brady* violation by not bringing the evidence to

the attention of the defense.") (quoting *United States v. Brown*, 582 F.2d 197, 200

(2d Cir. 1978)).

Even assuming that Lew made an exculpatory statement regarding

Defendant's involvement, it was made on February 4, 2014, well after the jury

returned its guilty verdict on November 14, 2013. Thus, the Government did not

obtain, and therefore could not have disclosed, Lew's statement when it even

possibly could have affected the outcome of the trial. In short, there simply could

not have been a *Brady* violation.[12] Because Defendant fails to show that newly

discovered evidence of Lew's statement supports an independent constitutional

violation, Defendant's claim is not cognizable under § 2255.

---

[12] Defendant's Motion for Discovery seeks production of all unredacted statements made by Lew to the Government that would vindicate Defendant and answers to three questions: (1) Did Lew make a statement regarding Defendant's involvement with the charged drug conspiracy?; (2) Did Lew state that Defendant had no involvement?; and (3) Was information that would vindicate Defendant withheld when Lew was sentenced? ECF No. 313 at 1-2.

Because the Government's Supplemental Statement answers Defendant's questions, and because even if Lew made a statement on February 4, 2014 vindicating Defendant, it would not have affected the outcome of Defendant's trial, the Motion for Discovery is DENIED.

### 3.     *Attempt to Influence Crowley's Testimony*

Defendant alleges that the AUSA attempted to get Crowley to provide false testimony.  § 2255 Motion at PageID # 2874.  Defendant provides Crowley' affidavit, in which she states that she "felt intimidated and scared" by the FBI agents who went to her house to discuss a cell phone she purchased for Defendant.  Crowley Aff. at ¶ 3.  Crowley further states that she "was forced to come down to the office of [the AUSA] . . . to answer questions and make a statement[.]"  *Id.* ¶ 4.  While at the AUSA's office, Crowley states that the AUSA:

> kept stating that [Defendant] and [Lew] came to my house asking me to get them a phone on multiple occasions[.]   [The AUSA] kept insisting that [Defendant] and [Lew] asked me to get the phone for them even after I told him multiple times that me and my husband insisted [that we] get [Defendant] a phone on his release [from custody for an unrelated offense] to help [Defendant with a] job and so we could keep in contact with them once he was released.

*Id.*

During trial, however, Crowley testified as follows:

Q     Ms. Crowley, you said that [Defendant] was on your family plan, correct?

A     Yes.

Q     How did that come about?

| A | He needed help, I guess he didn't have I.D. or credit, so I helped him out getting a phone, a telephone. |
|---|---|

Trial Tr. 2-157. Defendant concedes that Crowley did not provide false trial testimony, but claims nevertheless that because the AUSA intended to elicit false testimony, he was denied his rights to due process and a fair trial. § 2255 Motion at PageID # 2874. The court disagrees.

A defendant's right to due process is violated when a prosecutor's misconduct, when viewed in context of the entire trial, "infected the trial with unfairness." *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986); *see United States v. Reyes*, 660 F.3d 454, 461 (9th Cir. 2011) ("When reviewing for prosecutorial misconduct, we consider in the context of the entire trial 'whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial.'") (quoting *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir. 1985)). The first inquiry is whether the prosecutor's conduct was improper, and if so, the second is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). Thus, even where a prosecutor has committed misconduct, there is no due process violation unless such misconduct had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht*, 507 U.S. at 637; *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

Here, Crowley did not in fact provide false testimony. That is, the AUSA's alleged misconduct — even if true — could not have had any effect whatsoever on the jury's verdict and therefore, did not "infect[] the trial with unfairness." *Darden*, 477 U.S. at 181. Thus, Defendant has shown no independent constitutional violation. And absent an independent constitutional violation, Defendant's claim is not cognizable under § 2255.

## B.      Prosecutorial Misconduct

In Grounds Three and Six, Defendant asserts claims for violation of his constitutional rights to due process and a fair trial based on numerous incidents of alleged prosecutorial misconduct. Defendant asserts that the AUSA: (1) made six "references to evidence he did not produce" during his opening statement, § 2255 Motion at PageID #2898-901; (2) made ten "serious and repeated material misstatements of facts not in evidence" during his closing argument, *id.* at PageID # 2902-07; (3) "failed to comply with the Court order" prohibiting his witness, Miller, from using the word "federal" in conjunction with halfway house, at PageID # 2909-10; (4) improperly defamed Defendant during closing argument by

repeatedly calling him "sloppy," at PageID # 2966-67; and (5) altered evidence by adding Defendant's phone number to Miller's phone, *id.* at PageID # 2907-09.

Defendant did not raise any of these claims of prosecutorial misconduct on direct appeal. Defendant's claim that the AUSA altered evidence by adding Defendant's phone number to Miller's phone, however, could not have been presented on appeal without further factual development. *See Bousley*, 532 U.S. at 621-22; *Braswell*, 501 F.3d at 1150 n.1. Thus, with respect to all but the claim of altered evidence, Defendant must show cause and prejudice or actual innocence to overcome procedural default, which he fails to do. And Defendant does not claim that any incident of alleged prosecutorial misconduct establishes his actual innocence. As before, Defendant argues only that these incidents deprived him of his rights to due process and a fair trial.

The court first addresses claims of alleged prosecutorial misconduct for which Defendant must show cause and prejudice in order to overcome procedural default, that is, claims based on the AUSA's alleged misstatements of fact during opening statement and closing argument, Miller's testimony about a "federal" halfway house, and the AUSA's reference to Defendant as "sloppy." Because his claim that the AUSA altered evidence is not subject to a cause and prejudice analysis, it will be discussed later.

Defendant attempts to establish cause by alleging that evidence of prosecutorial misconduct "was not discovered until after direct appeal was affirmed, and needed to supplement the record." § 2255 Motion at PageID # 2857, 2859. But Defendant was present to hear the AUSA's opening statement and closing argument, as well as Miller's testimony. Accordingly, Defendant fails to establish cause for not raising these claims of prosecutorial misconduct on direct appeal.

But even if Defendant could establish cause, for the reasons discussed below, he also fails to establish prejudice. As set forth above, a defendant's right to due process is violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden*, 477 U.S. at 181-83. Courts first determine whether the prosecutor's conduct was improper, and if so, then determine whether such conduct infected the trial with unfairness. *Tan*, 413 F.3d at 1112. That is, even assuming the prosecutor's conduct was improper, the court must determine whether any misconduct, considered in the context of the entire trial, appears likely to have affected the jury's discharge of its duty to judge the evidence fairly. *See Brecht*, 507 U.S. at 637; *see also Reyes*, 660 F.3d at 461. The court addresses prejudice for each of Defendant's allegations in turn.

### 1. Opening Statement

Opening statements "should be limited to a statement of facts which the [party] intends or in good faith expects to prove." *Leonard v. United States*, 277 F.2d 834, 841 (9th Cir. 1960).

Before counsel presented their opening statements, the court instructed the jury repeatedly that statements and argument from counsel are not evidence:

> Now, the following things are not evidence and you must not consider them as evidence in deciding the facts of the case.
>
> One, the statements and arguments of the attorneys. . . .
>
> I will not allow you to take notes during the lawyers' opening statements and closing argument. Because as I told you earlier, neither of those constitute evidence. . . .
>
> Now, trial is about to begin . . . . First, each side may make an opening statement. Again, an opening statement is not evidence. It is simply an outline, or sometimes what's called a "roadmap," to help you understand what that lawyer expects his side of the case to show.

Trial Tr. at 1-5 to -6, -12, -14. And the court reiterated this point at the end of trial when giving jury instructions:

> The term "evidence" includes the sworn testimony of the witnesses and the exhibits admitted in the record.

> Remember that any statements, objections, or arguments
> made by the lawyers are not evidence in the case.
> . . .
>
> [I]t is your own recollection and interpretation of the
> evidence that controls in the case.  What the lawyers say
> is not binding on you.

*Id.* at 6-8.  Jurors are presumed to "follow their instructions."  *United States v. Smith*, 831 F.3d 1207, 1215 (9th Cir. 2018) (citing *United States v. Heredia*, 483 F.3d 913, 923 (9th Cir. 2007) (en banc)).

The court discusses in detail below each alleged instance where during his opening statement, the AUSA referred to evidence that he did not later introduce into evidence and determines that each instance, at most, was minor. And given the court's instructions to the jury, none of the minor inaccuracies in the AUSA's description of evidence he intended to introduce during trial could have had a "substantial and injurious effect or influence in determining the jury's verdict." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).  Thus, the AUSA's minor inaccuracies during opening statement did not infect the trial with unfairness.  *See Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112.

a. *"Mr. Young"*

Defendant alleges that during opening statement, the AUSA stated that "Mr. Young" would provide testimony regarding a conversation among the

co-conspirators in the Jack in the Box parking lot, but there was no such testimony from a "Mr. Young." *See* § 2255 Motion at PageID # 2898. In fact, the AUSA stated that after Jones and Lew met up at the Jack in the Box parking lot,

> Not much longer later another vehicle comes. A gold Pathfinder. In the Pathfinder there are two subjects. The driver, who is later identified as Joshua Miller — and Joshua Miller will testify in this case, and I'll talk more about him. The front seat passenger was Mr. Drummondo-Farias. The four of them are talking, observed talking. Obviously law enforcement doesn't know what they're talking about, but what Mr. Miller and Mr. Young will tell you was that they were talking about what was going on. Mr. Miller, he had lived previously at 1638 Young Street. He knew what the mailman looked like. And he told his other friends, [t]hat's not the regular mailman. That's not the guy who normally delivers the mail. And so he was nervous.

Trial Tr. at 1-30. In context, it is clear that the AUSA was not actually referring to a fifth person, a "Mr. Young." Rather, after clearly identifying the four co-conspirators, he stated that he would present testimony regarding the topic of a conversation among them at the Jack in the Box. And Miller did provide such testimony. *See* Trial Tr. at 5-79 - 5-80. The reference to "Mr. Young," made just before the AUSA stated that Miller's apartment was on Young Street, was just a simple mistake that neither rises to prosecutorial misconduct nor infected the trial with unfairness. *See Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112.

Consequently, Defendant cannot show that he was prejudiced by the AUSA's reference in his opening statement to a "Mr. Young."

### b. Payment of $100 to Jones

During his opening statement, the AUSA stated that Jones "was offered $100.00 by Mr. Drummondo-Farias to go to Joshua Miller's old apartment and wait for the box and accept it." Trial Tr. at 1-30. But Jones testified that it was Lew, not Defendant, who offered him the $100. *Id.* at 3-171 to -72. Defendant argues that this error misled "the jury in believing that [Defendant] orchestrated . . . the receiving of the parcels of drugs from the Mainland supplier." § 2255 Motion at PageID # 2899.

Defendant is correct that the AUSA's statement that Defendant offered to pay Jones, in retrospect, was not accurate. Rather, according to Jones' testimony, it was Lew who offered to pay him. But because *Miller* testified that it was Defendant's idea for Jones to receive the package and to use Miller's old apartment, *see id.* at 5-67 to -68, the jury could reasonably infer that Defendant orchestrated the receipt of parcels through the mail. The AUSA's minor error did not infect the trial with unfairness, *see Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112, and therefore, Defendant fails to show prejudice based on this error.

### c.    *"Common tactic"*

During opening statement, the AUSA said that investigating agents would testify that a common tactic used by drug traffickers is to use a mule, Trial Tr. at 1-30 to 1-31, — someone willing to accept a package for $100 — but no agent provided such testimony.  Defendant argues that the AUSA's statement "predisposed the jury toward a guilty verdict."  § 2255 Motion at PageID # 2899.

But Jones testified that he accepted other parcels that he assumed contained drugs for Defendant and/or Lew at another address for $50 or $60 each time.  *See id.* at 3-175.  And Miller testified that that it was Defendant's idea to use Jones to accept the package at Miller's apartment.  *Id.* at 5-67 to -68.  Thus, the evidence supports a finding that it was a tactic commonly used by Defendant.  When viewed in light of the ample evidence introduced at trial, and the jury instruction that statements and argument from counsel are not evidence, the AUSA's failure to produce any agent's testimony on this point does not render the trial fundamentally unfair.  *See Darden*, 477 U.S. at 181-83; *Reyes*, 660 F.3d at 461.  That is, Defendant fails to establish prejudice.

### d.    *Counter-surveillance*

During his opening statement, the AUSA said that,

the surveillance agents that were in the area saw the red Acura driven by Mr. Lew and the gold Pathfinder driven

> by Mr. Miller and occupied by Mr. Drummondo-Farias
> driving around Young Street, up and down Young Street,
> kind of doing circles in what the agents believed was
> called "counter-surveillance." . . . And the undercover
> agents will tell you the[re] were a couple times — they
> literally had to duck down because they saw the vehicles
> that they had heard over the radio that were involved in
> this possibly.

Trial Tr. at 1-31. Defendant alleges that the jury was "predisposed . . . toward a

guilty verdict" by these statements because no undercover agent testified about

any alleged counter-surveillance. § 2255 Motion at PageID #2899-900.

But even though no agent testified about counter-surveillance, Miller

did. Miller testified about specific counter-surveillance measures he and

Defendant engaged in near the Young Street apartment:

> A      I picked [Defendant] up . . . and we drove around
> the block a few times, looking for undercover
> agents, and then we walked around a few times.
> . . .
>
> Q      [Y]ou said you got back into the vehicle and you
> went to Young Street.
>
> A      Yes.
>
> Q      Correct? Okay. And what was the purpose of
> going to Young Street at that time?
>
> A      We were driving around the block looking for any
> signs of undercover cops.
>
> Q      Why were you doing that?

A        "Cause we knew the box was coming, just to be
         safe.

. . .

Q        So you and [Defendant] were in the car together?

A        Yeah.

Q        All right.  So you said you drove around the block
         a few times?

A        Yes.

Trial Tr. at 5-68, -76 to -77.  Miller's testimony supports a finding that Defendant

and his co-conspirators engaged in counter-surveillance.  The AUSA's failure to

procure any agent's testimony on the issue of counter-surveillance did not render

trial fundamentally unfair.  *See Darden*, 477 U.S. at 181-83; *Reyes*, 660 F.3d at

461.  Thus, Defendant fails to establish prejudice.

         e.        *DEA agent's testimony*

         The AUSA stated during opening statement that DEA agent Carney

would testify that prior to arresting Defendant at AMSC, she "noticed [Defendant

and Miller] because they were at a pay phone, and she'll tell you her thought

process was something to the effect of what 20-year-olds use a pay phone

anymore."  Trial Tr. at 1-33.  In fact, when questioned about finding and arresting

Defendant and Miller at AMSC, Agent Carney testified:

A        . . .  We were looking for the gold Pathfinder as
          well as the two individuals that had been seen
          earlier on surveillance.

. . .

Q        Okay.  Did you observe the two individuals that
          you were looking for at that time . . . ?

A        Yes . . . .

. . .

Q        . . . Where did you first see them?

A        . . . I saw them at — on the — by . . . the phone
          bank that was closer to Sears.

. . .

Q        Was there anything about them that caught your
          attention?

A        Yes, they seemed to be acting like they weren't
          together, although they were together.  They would
          meet up at a phone — at one of the pay phones or
          speak for a few moments, and then separate as
          though acting like they didn't want to appear
          together.  They seemed nervous.

Q        Okay.  Did you eventually assist in taking either of
          those individuals into custody?

A        Yes, I assisted in arresting both of those
          individuals.

*Id.* at 4-80, -82 to -83.  Defendant argues that the difference between Agent

Carney's testimony about what caused her to notice Defendant at AMSC and the

AUSA's opening statement "predisposed the jury toward culpability." § 2255 Motion at PageID #2900. The court disagrees.

The reason Agent Carney first noticed Defendant and Miller at AMSC is irrelevant to the issues to be determined by the jury. There is no dispute that Defendant and Miller were arrested at AMSC in the vicinity of a bank of pay phones. Thus, the AUSA's failure to elicit testimony from Agent Carney completely consistent with his opening statement did not infect the trial with unfairness. *See Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112. Therefore, Defendant fails to establish prejudice.

> f.    *Request to use Miller's phone*

During opening statement, the AUSA said that Miller will testify that after Jones and Lew failed to arrive at AMSC with the drugs, "[Defendant] was using the pay phone to make calls. That [Defendant] was asking [Miller] to use his phone to make the calls. And then when [Defendant] got arrested, he had no phones in his — in his possession." Trial Tr. at 1-36. In fact, on direct examination Miller testified:

> Q    We were trying to call [Jones] and [Lew].
> . . .
>
> Q    What — what phone were you using to try and call them?

A       I was using my phone, and [Defendant] was using a pay phone.

Q       Now, had you taken back the two phones that you had given to [Defendant] earlier that you were holding?

A       No.

Q       Did you see them in his possession?

A       No.

Q       But he was using a pay phone?

A       Yeah.

Trial Tr. at 5-83.  And on redirect examination, he further testified:

Q       Just prior to being arrested at Ala Moana Center, did anyone else besides yourself have possession of your iPhone?

A       [Defendant].

Q       Well, how — well, how did he have possession of it, first of all?

A       He asked for my phone while we were in the food court.

Q       Why?

A       He didn't say why.

Q       Did you see him make calls on the phone in your presence?

A       No.

Q       Did you see him doing anything with the phone in
        your presence?

A       Yeah, he was going through the phone.

Q       What do you mean by "going through the phone"?

A       He was using it, you know, looking through the
        phone.

Trial Tr. at 5-122 to -23.

Defendant argues that, contrary to the AUSA's opening statement,
Miller did not testify that Defendant asked for Miller's phone "to make the calls."
§ 2255 Motion at PageID # 2901.  But Miller did testify that after Jones and Lew
failed to arrive at AMSC and around the time Miller and Defendant both tried to
reach Lew and Jones, Defendant (1) asked for Miller's phone, (2) used Miller's
phone (although not to talk to anyone), and (3) used a pay phone rather than his
own phones to try to call Jones and Lew.

Miller's testimony supports a finding that Defendant took steps to
avoid using his own phones to contact Jones and Lew after they failed to arrive at
AMSC.  Miller's testimony further supports a finding that Defendant asked for and
used Miller's phone in some fashion during this time.  Thus, the evidence did not
clearly contradict the AUSA's statement.  But regardless, the slight discrepancy

between the AUSA's statement and Miller's testimony did not render the trial fundamentally unfair. *See Darden*, 477 U.S. at 181-83; *Reyes*, 660 F.3d at 461. Thus, Defendant fails to establish prejudice.

### 2. *Closing Argument*

A prosecutor should not misstate the evidence during closing argument. *Darden*, 477 U.S. at 181-82 ; *United States v. Hermanek*, 289 F.3d 1076, 1101 (9th Cir. 2002). But counsel are generally "given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253-1254 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)).

And as set forth above, the court instructed the jury repeatedly that statements and argument from counsel are not evidence. Trial Tr. at 1-5 to -6, -12, -14, 6-8. Below, the court addresses each instance where during closing argument, the AUSA allegedly misstated the evidence.

### a. *Payment of $100 to Jones*

During closing argument, the AUSA stated that Defendant "paid his long-time acquaintance Brandon Jones $100 or less to accept drug parcels for him[.]" Trial Tr. at 6-24.

As set forth above, Jones testified that it was Lew, not Defendant, who offered him the $100.  *Id.* at 3-171 to -72.  But Jones further testified that while he was "not a hundred percent sure" who paid him "[m]aybe 50, 60 bucks" for receiving prior parcels, it was "one of the two," referring to "[Defendant] and [Lew]."  *Id.* at 3-175.  Explaining why he was willing to accept those prior parcels, Jones testified that he "just wanted to help some friends out."  *Id.* at 3-176.

Based on Jones' testimony, it was reasonable to infer that Jones accepted drug parcels to help out both Defendant and/or Lew, and that he was paid $100 or less by his "friends" — Defendant and Lew.  And, as set forth above, because Miller testified that it was Defendant's idea for Jones to receive the package and to use Miller's old apartment, *see id.* at 5-67 to -68, it could reasonably be inferred that Defendant orchestrated the payment of $100 to Jones.  Moreover, Defendant was charged with conspiracy.  Thus, the AUSA's statement was a fair comment — that a conspirator paid Jones $100.

And given the ample other evidence introduced at trial, even if the AUSA's statement could be construed as a minor misstatement of the evidence, it did not infect the trial with unfairness.  *See Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112.  Therefore, Defendant fails to show prejudice.

> b.    *Operation*

During closing argument, the AUSA stated that Defendant "had an operation going.  That was the word Mr. Camacho used.  The word that Joshua Lew had used when he was describing and propositioning Mr. Camacho initially." Trial Tr. at 6-48.  Defendant argues that Camacho testified that "it was *Lew* who had an 'operation happening here.'"  § 2255 Motion at PageID # 2902 (emphasis added).

In fact, Camacho testified that when he told Lew that Camacho had a possible source for methamphetamine, Lew "was excited because . . . [t]here was a market for . . . that product here in Hawaii, and he knew the people to distribute it." Trial Tr. at 4-159 to -161.  Camacho then testified that Lew clarified that it was not "people . . . he knew who could distribute it," but a "person" — "[h]is brother Jacob."  *Id.* at 161.  Camacho testified that Lew "spoke about having some . . . operation happening here.  That his brother was — was well connected."  *Id.* at 4-168.  And Camacho further testified that Lew was "talking about how making money is something that his brother was good at, and that . . . he was able to make it happen."  *Id.* at 4-168.

Viewing Camacho's testimony as a whole, it can reasonably be inferred that Lew referred to a drug distribution operation involving both Lew and

Defendant.  It can also reasonably be inferred that when Lew described Defendant as the one who was able to "make it happen," that Lew was describing Defendant as the driving force behind a profitable drug distribution operation.  Because Defendant was charged with conspiracy, and Camacho testified about Lew's use of the word "operation" involving both Lew and Defendant, the AUSA's statement was a fair statement of the evidence.  But even if Camacho's testimony could be construed as referring to Lew's operation only, that statement alone did not infect the trial with unfairness.  *See Darden*, 477 U.S. at 181-83; *Tan*, 413 F.3d at 1112.  There was ample evidence introduced at trial that Defendant was heavily involved in the charged drug distribution conspiracy.  Therefore, Defendant fails to show prejudice.

      c.     *Jade Fua*

During closing argument, the AUSA stated that witness Jade Fua "admitted [that he] sold small amounts of cocaine, marijuana, pills," and that he was a "regular drug user" with an "expensive habit" of "$500 a week."  Trial Tr. at 6-50.

In fact, Mr. Fua testified that he had been involved in the distribution of drugs, *id.* at 2-50 to -52, -88 to -92, -94, -108, but did not testify to using drugs. But Mr. Fua's testimony related to Count 2, and the jury acquitted Defendant of

Count 2.  Thus, Defendant cannot show that he suffered prejudice from the AUSA's partial misstatement.

### d.    *Corroboration of testimony by Miller and Jones*

Defendant contends that during closing argument, the AUSA stated that "there was a corroboration of testimonies by both Joshua Miller and Brandon Jones as to a fact (regarding the conversation at Jack in the Box), *that they both overheard* [*Defendant*] saying: 'Well, you know, if they would have — they would have arrested him by now.'"  § 2255 Motion at PageID # 2903 (emphasis added).

But the AUSA did *not* say that both Miller and Jones heard the conversation between Defendant and Lew.  During closing argument, the AUSA stated that "Miller's testimony . . . was corroborated by Brandon Jones's testimony."  Trial Tr. at 6-51 to -52.  The AUSA went on identify several instances where Miller and Jones provided similar testimony.  *Id.*  One of those instances was regarding a conversation between Defendant and Lew when "Jones overhears him saying, Well, you know, if they would have — they would have arrested him by now."  *Id.* at 6-51.  "That's corroborated by both Joshua Miller and Brandon Jones."  *Id.*

In fact, Jones testified that once all four were inside the Jack in the Box, he overheard a conversation that "if they were going to bust me, I would have

got arrested by now. I wouldn't have been able to walk away like that." Trial Tr. at 3-182. When asked who said that, Jones replied "all three." *Id.* Upon hearing that, Jones "told all three of them" that he didn't "want to be a part of this no more," but Defendant told him that he would "have to go back and get [the package]." *Id.*

And Miller testified that once inside the Jack in the Box, "Jake and his brother sat down and talked, and then Brandon Jones was in line." Trial Tr. at 5-80. When asked if he was part of that conversation, Miller responded "No," but that "Josh mentioned that he saw a white Durango follow the mail truck in" and that they "were worried about it." *Id.* Miller said that he told both Defendant and Lew about the mailman, and that Defendant "said that he's seen multiple mail trucks on the street before and it's probably nothing to worry about." *Id.* When asked what was discussed then, Miller said that Jones "seemed a little worried," but Defendant told Jones "to just go and do it." *Id.* at 5-81.

In sum, both Jones and Miller testified that Defendant and Lew spoke at the Jack in the Box, that Jones overheard a specific comment by Defendant that Jones would have been arrested if agents were monitoring the package delivery, that all four were present for a continuation of that conversation during which Jones expressed his reluctance to go back, and Defendant told Jones that he had to

return to the apartment to get the package.  Although Miller did not testify that he heard the specific comment Defendant made to Lew, his testimony corroborated Jones' account of the general conversation among the four of them.  In context, the AUSA's minor misstatement that Miller overheard Defendant's comment to Lew neither negated the AUSA's statement — that Miller corroborated Jones' testimony — nor rendered the trial "fundamentally unfair."  *See Darden*, 477 U.S. at 183; *Reyes*, 660 F.3d at 461.  Given the ample evidence of Defendant's wrongdoing and the corroboration of the general conversation at the Jack in the Box, Defendant has failed to show prejudice.

> ### e.  *Mr. Tolentino*

In rebuttal to defense counsel's closing argument, the AUSA identified examples of what he described as defense counsel's misstatements of the evidence.  For example, the AUSA stated:

> Joseph Tolentino said nothing about getting the ticket for
> Mr. Drummondo-Farias' uncle.  [Defense counsel]
> wanted him to say that.  He asked him, Oh, didn't Jake
> tell you this was for his uncle, a sick uncle?  What did
> Mr. Tolentino say?  No.  He never said anything like that.
> Why is he telling you something that's different than
> what the evidence was?

Trial Tr. at 6-87.  The AUSA was responding to the following statement during defense counsel's closing argument:

Mr. Tolentino, they call him to say, Well, Jake asked me to get a ticket for his brother.  But Mr. Tolentino also said, I believe — and, you know, your recollection, rely on your recollection — he mentioned that Jake had told him something about the brother having to go see his uncle.  That's what Mr. Tolentino said.

*Id.* at 6-75.

In fact, Mr. Tolentino testified on direct examination as follows:

Q      Did you ever assist [Defendant] in obtaining airline tickets?

A      Yes, I did.

Q      How did that come about?

A      Well, he called me and asked me — oh, he told me that he didn't have a credit card, so if I could buy a ticket for his brother.
. . .

Q      Okay.  So you said, No problem?

A      Yes.
. . .

Q      Okay.  Do you recall who the flight was for?  Who was —

A      Yes, his brother Josh.

Trial Tr. at 4-137 to -38.  And on cross-examination, Mr. Tolentino testified as follows:

> Q     Mr. Tolentino, isn't it true that when Jake asked
> you to do this for his brother, he also told you it's
> because they had an uncle on the Mainland who
> was ill and his brother was traveling to see his
> uncle? Did he tell you that?
>
> A     I didn't recall that.

*Id.*

Defendant claims that the AUSA made three separate misstatements of the evidence in his closing argument. First, Defendant contends that Mr. Tolentino had established that he bought an airline ticket for Lew and therefore, defense counsel never wanted Mr. Tolentino to say that he bought an airline ticket for Defendant's sick uncle. *See* § 2255 Motion at PageID # 2904. Second, Defendant argues that there is no evidence that Defendant told Mr. Tolentino that the ticket was for a sick uncle, but rather, that it was for Lew to visit the uncle. *Id.* at PageID # 2905. And third, that in response to defense counsel's question, Mr. Tolentino said "I didn't recall," and not "No." *Id.*

In context, the AUSA's statement was fair argument. Viewed as a whole, it is clear that Mr. Tolentino's testimony and defense counsel's argument referred to an airline ticket for Lew. At issue was the reason Lew needed the ticket. And when asked by defense counsel about whether the ticket was needed so that Lew could visit a sick uncle, Mr. Tolentino did not affirm that reason. The

AUSA could reasonably infer that by bringing up the issue, defense counsel hoped to get Mr. Tolentino to confirm that the ticket was to enable Lew to visit a sick uncle. But even if the AUSA's comments could be construed as misstatements, they did not refute the evidence, only defense counsel's statement. And the court instructed the jury multiple times that counsels' statements are not evidence. *See* Trial Tr. at 1-5 to -6, 1-12, 1-14, 6-8 ("Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case. . . . [I]t is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding on you."). Thus, Defendant fails to show prejudice based on the AUSA's statements refuting defense counsel's characterization of Mr. Tolentino's testimony.

f.       *O'Reilly Auto Parts parking lot*

During closing, defense counsel discussed inconsistencies in Miller's testimony. For example, counsel stated that "[Miller] and [Defendant] walk over to O'Reilly's to meet with Lew, and then they talk with Lew and they walk back. Well, who is sitting in O'Reilly's parking lot with Lew? At least two other agents. Did any of them tell you about seeing that? . . . They didn't see that. That didn't happen." *Id.* at 6-67. And when defense counsel discussed surveillance on the day the package was delivered, he stated that,

no one mentions Miller and [Defendant] walking over to
O'Reilly's, even though Miller is telling you that's what
happened.

Well, what else? Well, at Jack in the Box clearly Miller
was talking with Jones and [Defendant] was talking with
his brother. Which you might expect. Then [a
Government agent] says, well, later on they went inside
and they all talked. But he's across the street. I believe
it's King Street is across on — in the O'Reilly's parking
lot. He can't say what's going on in Jack in the Box
across the street through busy traffic, nor can he hear
what's being said.

*Id.* at 6-77 to -78.

During rebuttal, the AUSA said that defense counsel "keeps saying it
was at the O'Reilly Auto Parts parking lot," but "[t]here was no testimony about
the meeting at O'Reilly's Auto Parts. It was the Jack in the Box." Trial Tr. at 6-
87. Defense counsel objected to this statement, and the court overruled that
objection. *Id.* The AUSA then stated that "It was the Jack in the Box where the
meeting took place. That was consistent from everybody, except [defense
counsel]." *Id.* Defense counsel objected again, and the court instructed the jury to
"strike that 'except [defense counsel]' part." *Id.*

In fact, there was testimony about O'Reilly's Auto Parts parking lot
— several officers and agents testified that they were sitting there conducting
surveillance. *See* Trial Tr. at 2-191 to -92, 2-208 (Agent Costa); *id.* at 3-97 to -99,

3-106 (Officer Akana); *id.* at 4-76 to -79 (Agent Carney). And Miller did testify that before the package was delivered, he and Defendant went to Young Street "looking for any signs of undercover cops." Trial Tr. at 5-76. They "walked to . . . [Lew], who was parked down the street . . . [i]n O'Reilly's parking lot, I believe." *Id.* at 5-77. Miller testified that Lew was parked there "watching the Young Street apartment parking lot." *Id.* at 5-78. Miller and Defendant then left and went back to AMSC to wait for Lew's call alerting them that the mail had been delivered. *Id.* "After we got the call from his brother," they went to the "Jack in the Box restaurant" where the conversation among the four individuals set forth above took place. *Id.*

Thus, to the extent the AUSA stated that there was no testimony about O'Reilly's parking lot, he was mistaken. This misstatement, when viewed in context however, did not "infect[] his entire trial with error of constitutional dimension." *Frady*, 456 U.S. at 170. The jury heard evidence about what occurred at both locations — and particularly that the four conspirators met and conversed at the Jack in the Box, not O'Reilly's. The jury was instructed repeatedly that counsel's statements and argument are not evidence, and the jurors were instructed to rely on their recollections of the evidence. *See* Trial Tr. at 1-5 to -6, 1-12, 1-14, 6-8. And the court's instruction to strike the portion of the AUSA's statement

equating defense counsel's argument with evidence reinforced those prior instructions. Jurors are presumed to "follow their instructions." *Smith*, 831 F.3d at 1215; *see Penny*, 532 U.S. at 799. Thus, Defendant has failed to show prejudice.

> g.    *Lew's name*

Defendant contends that the AUSA misstated the evidence during rebuttal, when the AUSA stated that "Joshua Miller said that Joshua Lew's name was Farias, didn't know his name." § 2255 Motion at PageID # 2906. Defendant contends that Miller said that he "never gave them that name." *Id.* But the AUSA was pointing out alleged misstatements by defense counsel and was paraphrasing a statement defense counsel made during his closing argument. Defense counsel gave examples of what he argued were "untruths or lies" that Miller told to law enforcement and during trial testimony. Trial Tr. at 6-64. Defense counsel stated that when asked who was in the car with him, Miller said,

> Oh, it's Joshua Farias. And he knew – he grew up with Joshua Lew all his life. It's his good friend. He knows that his name is Joshua Lew. But he doesn't tell that to the agent. Does it seem like he's trying to protect Joshua Lew?

*Id.* at 6-65.

In fact, during defense counsel's cross-examination, Miller testified as follows:

Q   And growing up you knew his name to be Joshua Lew, correct?

A   Yes.

Q   On the day you were arrested and when you were being interviewed and they asked you, the agents asked you who was in the red or maroon Acura, you tell them the person in that car was Joshua Farias, right?

A   I never gave them that name. They already had that name.

Q   Well, you agreed, right?

A   Yeah.

Q   You didn't say to them, Well, no, actually his name is Joshua Lew. You didn't say that, did you?

A   Well, at that point I wasn't sure if it was Joshua Lew Farias or, you know, because Jake has two last names. I know that they're brothers, so I thought it could be possibly Farias, too.

Q   So you didn't go back or you didn't say to them, Well, his name is Joshua Lew, did you?

A   No.

Q   You didn't say, Well, maybe has two names, but I know him as Joshua Lew. You didn't say that, right?

A   No.

Trial Tr. at 5-115 to -16.

In rebuttal, the AUSA argued that it did not matter what name Miller gave for Lew because in his phone contacts list, he "referenced him, not by his last name," but as "Josh, Jake's bro." *Id.* at 6-88.

Although Miller did say that he never gave agents the name Joshua Farias, he also did not correct the agents when they referred to Lew as Joshua Farias. Further, Miller admitted that he did not actually know whether Lew's name included Farias. Thus, whether paraphrasing defense counsel or Miller's testimony, the AUSA's statement was not improper.

Defendant also argues that he was prejudiced because the AUSA used this example to argue a "fact not in evidence" — "Miller's contacts list, in his phone." § 2255 Motion at PageID # 2906. But Miller testified that the number saved in his contacts list for Lew was listed under "Josh Jake's bro." Trial Tr. at 5-75.

### h.  *Western Union policy*

Finally, Defendant argues that the AUSA "accused defense counsel of 'completely misstating the evidence'" by stating that defense counsel's reference to testimony that Western Union's policy was uniform was "exactly 100 percent incorrect." § 2255 Motion at PageID # 2906 (citing Trial. Tr. at 6-89).

Defense counsel stated in his closing argument that Foodland employees testified that the Western Union "policy is the same [at] every Foodland, always followed, right?" Trial Tr. 6-76. Defense counsel then referenced inconsistencies between Miller's initial statement to agents and his trial testimony about who sent Western Union wires, and inconsistencies between Miller's testimony and the testimony from Foodland employees regarding what different Foodland locations required in terms of I.D.

In fact, when asked by defense counsel if "the Western Unions at the different Foodlands . . . all follow the same Western Union policies," Ms. Kiluwe, a second assistant manager at the AMSC Foodland, testified "Yes." *Id.* at 4-98. Ms. Kiluwe also testified that she processed a request at issue in this case on January 22, 2012, and that the policy had changed after January 2012 allowing customers to provide a social security number verbally rather than by I.D. *Id.* at 4-99, -101.

Ms. Smiley-Driver, a Foodland clerk at another location, testified that the Western Union policy changed "three, almost four years" before the date of her November 7, 2013 trial testimony, allowing a customer to provide a social security number verbally. *Id.* at 4-106 to -07, 10. Thus, her testimony contradicts Ms. Kiluwe's about what policy was in effect on January 22, 2012. Ms. Smiley-Driver

further testified, however, that the policy was the same at other Foodland locations. *Id.* at 4-106 to -07.

Defense counsel's statement — that according to the testimony by Foodland employees all Foodlands have the same Western Union policy — was not wrong.  But because the evidence also showed that Foodland employees gave inconsistent testimony about which policy was in effect on January 22, 2012, the AUSA was well within the wide latitude granted during closing to argue that defense counsel's statement was incorrect, based on the reasonable inference that different Foodland locations were implementing different policies on that day.

But even if the AUSA's statement exceeded that wide latitude, viewing counsels' arguments in the context of the whole trial, including both verbal testimony and business records documenting the two wires at issue, and given the court's multiple instructions that counsels' statements are not evidence, Defendant fails to show prejudice or constitutional error resulting from the AUSA's statement.

### 3. *"Federal" Halfway House*

Defendant claims that the AUSA failed to comply with a court order requiring Miller to refrain from mentioning the word "federal" in conjunction with "halfway house."  § 2255 Motion at PageID # 2909.

In December 2011, Defendant was living in a halfway house following a 2003 federal felony drug conviction. During trial, but prior to Miller's testimony, the court granted Defendant's motion in limine precluding the Government from eliciting any evidence related to Defendant's prior federal felony drug conviction. *See* Trial Tr. at 5-7; Def.'s Mot. in Lim., ECF No. 194; Minutes, ECF No. 231.

But contrary to the court's order, Miller testified that in December of 2011, Defendant was living at a "federal" halfway house. Trial Tr. at 5-50, 2-69. After that testimony was given, and out of the presence of the jury, the court discussed the matter with counsel and decided to give a limiting instruction to the jury:

THE COURT: All right. The jury has departed. Couple issues I want to discuss before we break. One is whether or not, [defense counsel], you request a limiting instruction at any point in time regarding the halfway house. And I don't know if you're — if you're going to be getting into this more, we can do it at that time —

[DEFENSE]: Yeah.

THE COURT: — we can do it after his testimony.

[DEFENSE]:      . . . I would ask that he from here on out refer to it only as the "halfway house." And number two —

THE COURT:   Let me just — can you find a way to get that word to him . . . ?  Or he's going to have to be brought up before the jury comes, and you can talk to him —

[AUSA]:          Yeah, I think that's probably best.

THE COURT:   Okay.  So we have to make sure we bring him in, get him on the stand, let [the AUSA] talk to him, let him know that during the break.

[AUSA]:          Just for the record, Judge, he was not instructed to say "federal halfway house" at any point.  It was "halfway house," so . . .

THE COURT:   I understand that, but he said it and —

[AUSA]:          No, no, understood.

THE COURT:   So make sure you tell him he's going to be asked more about that, not to say "federal," just to say "halfway house."

[DEFENSE]:      And then number two, I do plan on getting into that a little more in my questioning, and at that time I would ask for an instruction to the jury.

THE COURT:   All right.  So I will just instruct the jury that they've heard testimony that Mr. Miller picked up Mr. Drummondo-Farias at a halfway house, and it's only to put in

> context what happened that day, and you
> are not to consider any evidence
> concerning the halfway house in any
> way, shape or form essentially.

[DEFENSE]:     We would appreciate that, Your Honor.

Trial Tr. at 5-104 to -06.

Defendant argues that the AUSA engaged in misconduct by failing to "clearly instruct his witness NOT to say 'FEDERAL.'"  § 2255 Motion at PageID #2909.  That is, the AUSA failed to "insur[e] that Joshua Miller refrained from using the word FEDERAL in conjunction with 'halfway house.'"  *Id.*

But Defendant fails to allege facts showing that the AUSA failed to instruct Miller properly.  At best, Defendant contends that because Miller said "federal" halfway house, the AUSA must not have instructed him properly.  Or because the AUSA stated that he instructed Miller to say "halfway house," he must not have instructed him NOT to say "federal" halfway house.  Defendant's exercise in semantics is based on a complete lack of facts and runs afoul of common sense.

Moreover, even if the AUSA had failed to instruct Miller properly, Defendant suffered no prejudice.  The court gave the jury a limiting instruction regarding all mention of a halfway house, federal or otherwise:

> Ladies and gentlemen, you have heard evidence from Mr.
> Miller regarding a halfway house, and this evidence has
> been submitted to you for a limited purpose and a limited
> purpose only.  And that is to place in context his
> testimony, and [defense counsel] just engaged in what's
> called "impeachment" regarding that matter.  So it is to
> be considered by you for that limited purpose, the context
> and the impeachment, and for no other purpose.

Trial Tr. at 5-118.  It is presumed that jurors follow a court's limiting instruction.

*See United States v. Wells*, 879 F.3d 900, 937 (9th Cir. 2018) (citing *United States*

*v. Gallenardo*, 579 F.3d 1076, 1082 (9th Cir. 2009)).  Thus, a limiting instruction

is generally "sufficient to cure any prejudice to the defendant."  *Id.* (quoting *United*

*States v. Escalante*, 637 F.2d 1197, 1202-03 (9th Cir. 1980)).  Defendant fails to

show prejudice or constitutional error resulting from Miller's use of the word

"federal."

### 4.    *"Sloppy"*

Defendant claims that during closing argument, the AUSA "made

repeated 'improper remarks' by defaming [Defendant] in front of the jury by

calling him "SLOPPY" a total of nine (9) times."  § 2255 Motion at PageID

# 2966.  Defendant contends that this deprived him of due process and a fair trial.

*Id.*  The court disagrees.

During closing argument, the AUSA stated that "defendant got

sloppy."  Trial Tr. at 6-23.  The AUSA went on to say that "[d]espite the great

61

efforts [Defendant] took to distance himself and to set up other people to take the fall, he ended up doing exactly that." *Id.* at 6-23 to -24. The AUSA then identified numerous specific acts by Defendant that the AUSA characterized as "sloppy." Trial Tr. at 6-23 to -25, 6-39, 6-42.

Although a prosecutor generally should not demean a defendant by insult, *People of Territory of Guam v. Torre*, 68 F.3d 1177, 1179 (9th Cir. 1995), at issue is whether such comments deprived Defendant of due process and a fair trial. *See Darden*, 477 U.S. at 181 ("[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned. . . . . The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.").

Viewed in context, the AUSA's use of the word "sloppy" was merely a reasonable inference that Defendant's conduct was careless, based on the evidence introduced during trial. This is legitimate argument and was neither improper, nor prejudicial. *See Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (determining that prosecutor's "gratuitous insults" of the defendant as "old and feeble," and as a "deadbeat," "creep," and "liar" did not deprive defendant of a fair trial); *see also Lindsey v. Smith*, 820 F.2d 1137, 1155 (11th Cir. 1987) (holding that although the prosecutor's referral of defendant as "scum" during closing argument

was a "breach of propriety," it did not constitute a denial of due process); *Comtois v. McKee*, 2017 WL 2225105, at *8-9 (E.D. Mich. May 22, 2017) (finding no prejudice where prosecutor reasonably inferred from the evidence that the defendant "lied" and was a "predator"); *Verduzco v. Uribe*, 2013 WL 530593, at *12 (N.D. Cal. Feb. 11, 2013) (holding that prosecutor's comment that defendant shot victim because of "the slightest insult to the defendant's masculinity" was reasonably inferred from the evidence presented at trial and therefore, permissible).

In sum, Defendant has failed to establish cause and prejudice resulting from these claims of prosecutorial misconduct, and he does not claim that any incident of alleged prosecutorial misconduct establishes his actual innocence. Accordingly, these claims are procedurally barred and therefore fail.

### 5. *Altered Evidence*

Defendant claims that the AUSA "altered evidence by adding [Defendant's] old phone number (808) 221-0224" to Miller's phone contact list. § 2255 Motion at PageID # 2907. Because this claim could not have been presented on appeal without further factual development, it is not procedurally barred and will be addressed on the merits.

During trial, Miller testified that the phone produced at trial was his, and he read Defendant's old number — (808) 221-0224 — from his phone's

contacts list. Trial Tr. at 5-71 to -74. Defendant alleges that because that number was no longer in service when Miller started hanging out with Defendant, "there is no possible way that this phone number . . . could have been on Joshua Miller's phone contact-list, other than by someone putting it there deliberately (government attorney's prosecuting case is responsible for all evidence related to the case)." § 2255 Motion at PageID # 2908 (emphasis omitted). Defendant also points out that Miller testified that "he had possession of his phone prior to trial, in meetings (reviewing his contact list) with the [AUSA]." *Id.*

But Defendant's allegation that the AUSA put Defendant's phone number on Miller's phone was specifically refuted by Miller. Miller testified that multiple phone numbers for Defendant "were sent to [him] in a [single] text message." Trial Tr. at 5-70, -73 to -74. Without more, Defendant's bald, conclusory accusation neither establishes prosecutorial misconduct nor warrants an evidentiary hearing. *See Johnson*, 988 F.2d at 945 (explaining that conclusory allegations do not warrant an evidentiary hearing on a § 2255 motion); *see also Carver v United States*, 2018 WL 388620, at *3 (11th Cir. Jan. 12, 2018) ("[I]f a [movant's] claims are merely conclusory allegations unsupported by specifics, or if the record refutes the applicant's factual allegations . . . , a district court is not

required to hold an evidentiary hearing." (internal citation and quotation marks omitted)).

In short, Defendant's claim that the AUSA put Defendant's phone number on Miller's phone is neither supported by the record nor any alleged facts which, if true, would entitle him to relief. *See Rodrigues*, 347 F.3d at 824. His claim therefore fails.

## C.    Judicial Misconduct

In Ground Four, Defendant asserts claims for violation of his constitutional rights to due process and a fair trial based on the court's failure to declare a mistrial following (1) alleged prosecutorial misconduct during opening statement and closing argument, (2) Miller's use of the word "federal" in conjunction with "halfway house," and (3) the court's alleged advocacy for the Government and attempt to "cover up" Miller's improper testimony.  § 2255 Motion at PageID # 2911-17.  The first two bases for judicial misconduct arise from the same allegations discussed and refuted above.

The third basis for judicial misconduct arises from the discussion in court following a portion of Miller's testimony.  Defendant claims that when discussing Miller's use of the word "federal" with counsel outside of the presence of the jury, the court improperly "acted to advocate for the government and cover

this up," thereby assisting the AUSA "to make sure that his witness does not say the word FEDERAL." *Id.* at PageID # 2916-17. Defendant contends that this conduct shows that the court exhibited "bias and/or advocacy" against him. *Id.* at PageID # 2918. This discussion is set forth in detail above, and the court need not repeat it here.

Because Defendant did not raise his judicial misconduct claims on appeal, Defendant must show cause and prejudice or actual innocence to overcome procedural default, which he fails to do. Defendant does not contend that any incident of judicial misconduct — that is, the court's failure to declare a mistrial notwithstanding any of the alleged bases — establishes his actual innocence. Rather, Defendant argues only that the court's failure to declare a mistrial deprived him of his constitutional rights to due process and a fair trial. *See* § 2255 Motion at PageID # 2911-18.

### 1. *Cause*

Defendant was present in court during each instance upon which his claims of judicial misconduct are based — during opening statements and closing arguments, Miller's testimony, the court's discussion with counsel following Miller's testimony, and when the court issued a limiting instruction to the jury regarding Miller's testimony. Defendant provides no reason why he did not raise

his judicial misconduct claims on appeal, nor does he allege any external impediment to raising them on appeal. Thus, he fails to show cause.

## 2. **Prejudice**

Nor does he show prejudice. "Before a jury's verdict will be overturned because of the conduct of a trial judge . . . , 'it must appear that the conduct measured by the facts of the case presented together with the result of the trial, was clearly prejudicial to the rights of the party.'" *United States v. Bennett*, 702 F.2d 833, 836 (9th Cir. 1983) (quoting *United States v. Eldred*, 588 F.2d 746, 750 (9th Cir. 1978)). And this assessment must be made "in light of the evidence of guilt." *Id.* at 836 (citing *United States v. Poland*, 659 F.2d 884, 886, 894 (9th Cir. 1981)). "Judicial statements during trial constitute error only if they disclose actual bias on the part of the trial judge[.]" *United States v. Frazier*, 2009 WL 10660950, at *3 (D. Mont. Dec. 30, 2009) (citation omitted); *see United States v. Ball*, 711 F. App'x 838, 843 (9th Cir. Sept. 25, 2017) ("To succeed on [a judicial misconduct] claim, the record must show 'actual bias' by the trial judge 'or leave the reviewing court with an abiding impression that the judge's remarks . . . projected to the jury an appearance of advocacy or partiality.'" (quoting *United States v. Mostella*, 802 F.2d 358, 361-62 (9th Cir. 1986))).

For the reasons discussed above, Defendant failed to establish prejudice as a result of alleged prosecutorial misconduct during the AUSA's opening statement and closing argument, and as a result of Miller's testimony about a "federal" halfway house. Thus, he necessarily fails to show that the court's failure to declare a mistrial based on those incidents was "clearly prejudicial" to his rights to due process and a fair trial.

And Defendant's last two judicial misconduct claims — that because the court instructed the AUSA to talk to his witness again about the witness' improper use of the word "federal," and then issued a limiting instruction to the jury, the court was assisting the prosecution to the detriment of Defendant — are not supported by the record. To limit and/or cure any potential prejudice to Defendant, his *own* counsel *requested* that Miller be instructed not to say "federal" when providing further testimony and that the court issue a limiting instruction about Miller's reference to a halfway house. And the court granted those requests, thereby curing any potential prejudice to Defendant from Miller's improper testimony. *See Wells*, 879 F.3d at 937 (explaining that because jurors are presumed to follow a court's limiting instruction, such instruction is generally sufficient to cure any prejudice to the defendant). Thus, the court's instructions to the AUSA and jury do not show actual bias.

In sum, Defendant has failed to establish cause and prejudice resulting from any alleged judicial misconduct. And Defendant does not allege, nor could he, that any alleged incident of judicial misconduct is sufficient to establish his actual innocence. *See Muth*, 676 F.3d at 819. Accordingly, Defendant's claims based on judicial misconduct are procedurally barred and fail. And even considered on the merits, because the court's instructions do not show actual bias, Defendant's claims fail.

**D.    No Cumulative Error**

Finally, the court finds that there is no cumulative error. As set forth above, the AUSA, at most, made slight errors in his opening statement and closing argument stating that: (1) "Mr. Young" would testify; (2) Defendant, not Lew offered Jones $100 to accept a package; (3) certain agent testimony would be provided that was not provided; (4) Defendant asked Miller to use his phone to make calls; (5) Fua admitted that he was a drug user; (6) both Miller and Jones overheard Defendant making a comment to Lew in the Jack in the Box; (7) there was no testimony about O'Reilly Auto Parts parking lot; and (8) Miller didn't know Lew's last name.

The Ninth Circuit has found in certain cases that "although no single trial error examined in isolation is sufficiently prejudicial . . . the cumulative effect

of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). But there is no cumulative error where the cumulative effect of individual harmless errors is also harmless. *See United States v. Fernandez*, 388 F.3d 1199, 1256-57 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) ("To the extent that we have found that any claimed error . . . was harmless, . . . we conclude that the cumulative effect of such claimed errors is also harmless because it is more probable than not that, taken together, they did not materially affect the verdict."); *cf. United States v. Berry*, 627 F.2d 193, 201 (9th Cir. 1980) (holding cumulative error not reversible if it is more probably harmless than not); *United States v. Wallace*, 848 F.2d 1464, 1476 n.21 (9th Cir. 1988) (explaining that errors not rising to the level of plain error may be considered in assessing cumulative error).

Here, even though the AUSA made slight harmless mistakes in opening statement and closing argument, the court finds that the cumulative effect of those errors is also harmless. That is, given the strength of the overall evidence against Defendant and the court's repeated instructions to the jury that comments by counsel are not evidence, it is more probable than not that, taken together, such errors did not materially affect the verdict. *See Fernandez*, 388 F.3d at 1256-57.

## E.    Ineffective Assistance of Counsel

In Grounds Two and Five, Defendant claims that he was provided constitutionally ineffective assistance of counsel when his counsel failed to (1) object and/or move for a mistrial, (2) move for a new trial, or (3) appeal based on prosecutorial misconduct, judicial misconduct, and Miller's testimony when he said "federal" in conjunction with halfway house.  § 2255 Motion at PageID # 2876-93, 2894-96, 2966.  Defendant bases his claims on the same instances of alleged misconduct by the AUSA discussed above — six "references to evidence he did not produce" during his opening statement, ten "serious and repeated material misstatements of facts not in evidence" during his closing argument, altering evidence by adding Defendant's phone number to Miller's phone, failing to prohibit Miller from saying "federal" in conjunction with halfway house, and repeatedly calling Defendant "sloppy" during closing argument.  *Id.*  Additionally, Defendant claims that counsel provided ineffective assistance by failing to "do a thorough investigation into Brandon Jones' . . . mental health history, on whether he was 'competent to testify,' at trial."  *Id.* at 2893.

### 1.    *Legal Standard*

To prevail on an ineffective assistance claim, a movant must show that (1) counsel's representation was deficient, and (2) that the movant suffered

prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to

the first prong, representation is constitutionally deficient if it "fell below an

objective standard of reasonableness" such that it was outside "the range of

competence demanded of attorneys in criminal cases." *Id.* at 687-88 (internal

quotation marks omitted). Counsel "is strongly presumed to have rendered

adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Id.* at 690; *see Hughes v. Borg*, 898 F.2d 695, 702 (9th

Cir. 1990). "[S]trategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable; and strategic choices

made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgments support the limitations on investigation."

*Strickland*, 466 U.S. at 690-91. The court "'will neither second-guess counsel's

decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will

defer to counsel's sound trial strategy." *Matylinsky v. Budge*, 577 F.3d 1083, 1091

(9th Cir. 2009) (quoting *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir.

2001)).

And as to the second prong, the movant "must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable

probability is "a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* That is, the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). When determining a claim of ineffective-assistance-of-counsel, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697. In other words, any deficiency that does not result in prejudice necessarily fails.

### 2. Application of Standard

Here, with respect to Defendant's claim of ineffective assistance of counsel based on alleged instances of prosecutorial misconduct, judicial misconduct, and Miller's testimony, Defendant has not met the second *Strickland* prong.

The court previously discussed the facts underlying these bases for alleged ineffective assistance of Defendant's counsel. For the detailed reasons set forth above, none of the AUSA's comments during opening statement and closing argument resulted in prosecutorial misconduct. And to the extent the AUSA's comments in opening statement and closing argument included slight inaccuracies, the court repeatedly instructed the jury that such comments are not evidence. *See*

Trial Tr. at 1-5 to -6, -12, -14, 6-8.  In short, such comments neither affected the jury's verdict nor rendered the trial unfair.  *See Darden*, 47 U.S. at 181-83, *Reyes*, 660 F.3d at 461; *Tan*, 413 F.3d at 1112.  Further, as discussed above, the AUSA's alleged failure to insure that Miller did not say the word "federal" did not result in prosecutorial misconduct.  And because the court issued a limiting instruction to the jury, Miller's utterance of the word "federal" did not render the trial unfair.  Moreover, as set forth above, allegations that the AUSA added Defendant's old phone number to Miller's phone are specifically refuted by Miller's trial testimony.  Finally, as discussed above, neither the court's instruction to the AUSA to tell Miller not to say "federal" nor its provision of a limiting instruction to the jury regarding Miller's use of the word "federal" constituted judicial bias.

Thus, Defendant has not shown that had his counsel objected or moved for a mistrial based on any of the alleged instances of prosecutorial or judicial misconduct, or Miller's testimony, there is a reasonable probability that the trial result would have been different.[13]  *See Strickland*, 466 U.S. at 694.  And this is particularly true given the strength of the overall evidence against Defendant as set forth above.

---

[13] Thus, there is no basis for a motion for new trial or appeal on these issues.  That is, Defendant also fails to show prejudice under *Strickland* for counsel's failure to move for a new trial or appeal based on these issues.

The only remaining basis for Defendant's ineffective assistance of counsel claim is his allegation that counsel failed to investigate Brandon Jones' mental health history. *See* § 2255 Motion at PageID # 2893. Defendant states that he asked counsel "to investigate and/or follow up on an investigation into the mental health history of Brandon Jones, and whether or not he was competent to testify." Def.'s Aff. ¶ 34, ECF No. 307-3. Defendant argues that Jones' "mental health history is questionable." § 2255 Motion at PageID # 2984. He bases this argument on the fact that the admissibility of Jones' history of depression, drug use, suicidal ideation, and admission to a psychiatric hospital was raised in a discussion during a final pretrial conference. *See* § 2255 Motion at PageID #2983; Tr. at 17-22, ECF No. 269. After that discussion, the court deferred ruling on the admissibility of Jones' mental health status and treatment until trial. *Id.* at 21-22 ("I want to hear the direct testimony and then what you have leading up to the cross-examination on that from the defense side, and then I'll make a determination."). The issue of Jones' mental health never came up during trial.

Federal Rule of Evidence 601 codifies the "well-established principle . . . that witnesses are presumed competent to testify." *United States v. Skorniak*, 59 F.3d 750, 755 (9th Cir. 1995); *United States v. Devin*, 918 F.2d 280, 292 (1st Cir. 1990). Long ago, the Supreme Court recognized that even "a person affected

with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *Dist. of Columbia v. Arms*, 107 U.S. 519, 521-22 (1883). Stated differently, "[c]ompetency depends upon the witness' capacity to observe, remember, and narrate as well as an understanding of the duty to tell the truth." *United States v. Benn*, 476 F.2d 1127, 1130 (D.C. Cir. 1972). And determining whether a witness is competent to testify is a matter for the court in its considerable discretion. *See United States v. Brown*, 770 F.2d 768, 770 (9th Cir. 1985) (citing *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973)); *United States v. Gerry*, 515 F.2d 130, 137 (2d Cir. 1975).

Here, there was no reference to Jones' mental health history or treatment during trial. And Defendant does not allege that Jones was in fact incompetent to testify. Further, the court observed Jones' demeanor during the course of his testimony and there was nothing to suggest that Jones was incompetent as a witness. To the contrary, Jones testified at length and in detail about the events on January 27, 2012. And although trial was nearly two years later, Jones' testimony was consistent with the statement he provided to the Government about those same events immediately after his arrest on January 27,

2012.  *See* PSR ¶¶ 17, 22.  In short, there is no indication that Jones' memory was impaired or that he was unable to communicate his recollections during trial.  That is, Jones was competent to testify and his mental health history was therefore irrelevant.

And because it was irrelevant, Defendant cannot meet *Strickland's* first prong — that counsel's failure to investigate Jones' mental health history was deficient.  *See Strickland*, 466 U.S. at 687; *see also Harrington v. Richter*, 562 U.S. 86, 108 (2011) ("An attorney need not pursue an investigation that would be fruitless[.]").  Nor can Defendant establish *Strickland's* second prong — that but for counsel's failure to investigate Jones' mental health history, the trial result would have been different.  *See Strickland*, 466 U.S. at 694.  That is, Defendant has not shown actual prejudice under *Strickland*.

In sum, Defendant is not entitled to habeas relief on his claims of ineffective assistance of counsel.

## F.    Certificate of Appealability

Defendant's § 2255 Motion is DENIED as to all claims.  The court must now address whether Defendant should be granted a certificate of appealability ("COA").  *See* R. 11 Governing Section 2255 Proceedings (providing that "[t]he district court must issue or deny a certificate of appealability when it

enters a final order adverse to the applicant"). A COA may issue only if the defendant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court carefully reviewed all of Defendant's allegations and gave him every benefit by liberally construing them. Based on the above analysis, the court finds that reasonable jurists could not find the court's rulings debatable. Accordingly, a COA is DENIED.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the court DENIES Defendant's § 2255 Motion, DENIES the Motion for Discovery as moot, and DENIES a Certificate of Appealability. The Clerk of Court is directed to enter judgment and close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 31, 2018.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*United States v. Drummondo-Farias*, Cr. No. 12-00174 JMS (01), Order Denying (1) Motion Under § 2255 To Vacate, Set Aside, Or Correct Sentence, ECF No. 307; (2) Motion For Discovery, ECF No. 313; and (3) Certificate of Appealability